2010 UT 22

PEAK ALARM COMPANY, INC., a Utah corporation; Jerry D. Howe, an individual; and Michael Jeffrey Howe, an individual, Plaintiffs and Appellants,

v.

SALT LAKE CITY CORPORATION, a Utah municipal corporation; Shanna Werner, an individual; Charles F. "Rick" Dinse, an individual; Scott Atkinson, an individual; James Bryant, an individual; and John Does I–X, individuals, Defendants and Appellees.

No. 20080918.

Supreme Court of Utah.

April 16, 2010.

Rehearing Denied June 28, 2010.

1224 

Kenneth A. Okazaki, Stephen C. Clark, Arthur Fine, Kathleen E. McDonald, Salt Lake City, for plaintiffs.

J. Wesley Robinson, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case began with a telephone call for police assistance by a private alarm company. In time, this single call led to a misdemeanor prosecution and then this civil lawsuit. The call was made after a number of teenage girls set off burglar alarms at a Salt Lake City high school. Salt Lake City police concluded the caller, Michael Jeffrey Howe, violated a state statute criminalizing the making of a false alarm and charged him accordingly. Mr. Howe stated in the call that a Peak Alarm security guard had verified the break in. In reality it was a school employee who had confirmed the alarm and requested the alarm company summon police. The single-count criminal prosecution concluded with a directed verdict in Mr. Howe's favor in the Salt Lake City Justice

Court. Following the acquittal, Mr. Howe sued Salt Lake City along with several police department employees and administrators.

¶ 2 This appeal concerns that civil litigation. Mr. Howe alleges the district court committed reversible error in ruling on three motions. First, Mr. Howe challenges the district court's rejection of his motion for partial summary judgment. Mr. Howe attempted to use the directed verdict in his criminal prosecution as a predicate for summary judgment on the issue of probable cause, which was part of several of his claims. The district court concluded that the directed verdict and surrounding circumstances failed to prove police acted without probable cause in charging Mr. Howe. Second, Mr. Howe asserts the district court erred in dismissing his state claims when it granted Salt Lake City's motion for summary judgment based on procedural requirements imposed by the Utah Governmental Immunity Act (UGIA). Finally, Mr. Howe argues the district court erred in granting Salt Lake City's motion for summary judgment on his claims of civil rights violations arising under federal law. In all, the district court dismissed seven independent claims arising in federal law on the basis of qualified immunity, pleading errors by Mr. Howe, and deficiencies in connecting Salt Lake City and several supervisors to any constitutional deprivation by individual officers and employees.

¶ 3 We affirm the district court's holding that the directed verdict in Mr. Howe's criminal trial is not conclusive evidence that the city acted without probable cause. Also, the district court correctly rejected Mr. Howe's alternative argument by holding that all the facts before the court did not prove Salt Lake City acted without probable cause. However, we reverse the district court's grant of summary judgment in favor of Salt Lake City on Mr. Howe's state law claims. Summary judgment arising under the UGIA was in error because Mr. Howe provided a sufficient and timely notice of claims. As to Mr. Howe's federal claims alleging civil rights violations, the district court erred in

dismissing Mr. Howe's Fourth Amendment seizure claim because Mr. Howe presented facts that supported a claim that an unlawful seizure did occur and that officers lacked probable cause to support the seizure. We affirm the district court's dismissal of Mr. Howe's remaining six civil rights claims.

## BACKGROUND

### I. SALT LAKE CITY'S VERIFIED RESPONSE ORDINANCE

¶ 4 While this civil case is based on the events surrounding Mr. Howe's call to police on June 27, 2003, Mr. Howe alleges his prosecution was rooted in a long-standing acrimonious relationship between Peak Alarm and the Salt Lake City Police Department. The hostility, Mr. Howe alleges, began years earlier as the police department grew concerned over resources expended in responding to false alarms reported by private alarm companies. In response to police complaints that calls from private security firms were a waste of police resources, Salt Lake City officials enacted the verified response ordinance in December 2000. The ordinance precludes a police response to an "intrusion" alarm reported by a private security company without on-site verification from an alarm company employee. Salt Lake City Ordinance 5.08.095.

¶ 5 In addition to instituting the verified response policy within Salt Lake City, Shanna Werner, the department's alarm administrator, was occasionally quoted in trade publications as well as local and national media reports about the city's efforts to manage alarm company calls. Ms. Werner also spoke to city officials in other Utah communities about the program. As part of her public comments on the issue, Ms. Werner criticized the alarm industry as earning profits without providing any services, wasting public resources, and for preying on the fears of potential customers. Mr. Howe became part of this public debate as well. Most notably, in 2003 he became chair of a committee formed by the Utah Alarm Associa-

tion to lobby against the adoption of the verified response policy by other cities in Utah.

## II. BURGLAR ALARMS AND MR. HOWE'S CALL TO POLICE DISPATCH

¶ 6 In the early morning hours of June 27, 2003, the lunchroom staff arrived at West High School and began preparing meals for a summer lunch program. A supervisor turned off the security alarm in the lunchroom, cafeteria, and an adjacent hallway. She left the motion-activated alarms on in the rest of the school. Shortly before 9 a.m. the still-activated alarms went off. Two staff members reported two girls had entered the school and gone up to the second level. The supervisor called Peak Alarm. She asked Peak Alarm to send police because she "wanted to make sure [the girls] weren't up to some mischief" and no one on the lunchroom staff was "trained to deal with intruders." In an affidavit submitted in this case, the supervisor stated police never questioned her about the girls and what transpired in the school, but focused only on the information she gave to Peak Alarm.

¶ 7 Following a telephone conversation with the supervisor, a Peak Alarm employee called the Salt Lake City Police dispatch and requested police respond to a "burglar alarm." The police dispatcher refused to send officers to the school and added police would only be sent after school employees "called us from the school and asked us to help remove them." The Peak Alarm employee's subsequent attempts to contact the supervisor and other school officials were unsuccessful. The Peak Alarm employee apprised Mr. Howe, who was the alarm company's central station manager, of the situation. Mr. Howe then called police dispatch himself. The following conversation ensued:

> **Mr. Howe:** Hey, we have an actual burglar alarm going off at West High, and I guess my dispatcher just called up and said you guys weren't going to go on an actual burglar alarm?

> **Police dispatch:** No, we don't go on burglar—we haven't gone on burglar alarms for two years.

> **Mr. Howe:** This is an actual burglary in progress, it's been verified.

> **Police dispatch:** No, [the Peak Alarm employee] didn't say that, she said it was an alarm.

> **Mr. Howe:** ... We actually have people inside and my guard is asking for police assistance.

> **Police dispatch:** Okay, that's what I needed.

> . . .

> **Police dispatch:** Okay, and how many, how many?

> **Mr. Howe:** They said two or three kids.

> **Police dispatch:** Where at?

> **Mr. Howe:** Didn't get that information just the alarm's coming from the second floor, but they're running throughout the whole building.

> . . .

> **Police dispatch:** And where do we meet your guard at?

> **Mr. Howe:** Just in front of the school.

> **Police dispatch:** Is he in uniform or she?

> **Mr. Howe:** Yes, he is.

¶ 8 Over the course of the day, there were a number of additional conversations between Mr. Howe and dispatchers and a police officer to clarify what information had been conveyed to Peak Alarm, whether this was a panic alarm or a burglary alarm, and the status of the security guard. In these subsequent conversations, Mr. Howe readily acknowledged that he had assumed that a security guard from Peak Alarm had confirmed the unauthorized entry and that it was the guard who had requested police assistance. The most significant of these later conversations came in two interviews conducted by Salt Lake City Police Officer Shaun Wihongi. In the first interview, Officer Wihongi reported Mr. Howe claimed he was led "to

believe" the school employees "were in imminent danger" and he was unhappy that police refused to go to the scene after the initial call for police assistance. When asked why he made the specific statements about the security guard, Mr. Howe told Officer Wihongi, "[W]hatever it takes, I thought this was a panic alarm." In the second interview—which Officer Wihongi recorded—Mr. Howe reiterated that he believed school employees were in danger because "they had unauthorized people within the building that should not have been in there. . . . [S]omeone's life could potentially be in danger." Mr. Howe also stated, "If we're even charged for a false alarm, I don't care. I was just—hey, charge us if you have to, we'll be glad to pay it."

## III. MR. HOWE'S CRIMINAL CITATION AND PROSECUTION

¶ 9 Over the next few weeks, Mr. Howe attempted to contact Ms. Werner to discuss the police response to the high school. Ms. Werner did not return Mr. Howe's calls and felt "listening to more rhetoric was unnecessary." It wasn't until July 14, 2003, when Sgt. James Bryant met with Ms. Werner, that police began considering criminal charges against Mr. Howe. In considering charges, Sgt. Bryant focused on the information Mr. Howe provided to police dispatch. "The false information provided was that an employee or agent of Peak Alarm was on the scene, and that the employee or agent either had contact with or knowledge of unauthorized persons on the premises." In his review, Sgt. Bryant also noted Mr. Howe's "whatever it takes" statement to Officer Wihongi.

¶ 10 Sgt. Bryant decided a false alarm charge was appropriate because Sgt. Bryant judged Mr. Howe "knew [the statements] to be false, and that his intent in doing that was to elicit a response from the Police Department." On July 21, 2003, Sgt. Bryant and

another officer went to Peak Alarm's offices. After summoning Mr. Howe to the lobby area, Sgt. Bryant told Mr. Howe he was going to be arrested for making a false alarm. Rather than handcuffing Mr. Howe and taking him into police custody, Sgt. Bryant gave Mr. Howe the opportunity to avoid an arrest by signing and fingerprinting a citation for the misdemeanor of making a false alarm. The fingerprinting process was not equivalent to that used at a formal booking; Sgt. Bryant required a single thumbprint affixed to the citation. Police department policy requires that every misdemeanor citation include a fingerprint from the cited individual.

¶ 11 A jury trial on the criminal charge began on April 12, 2004. Following the Salt Lake City prosecutor's case in chief, the justice court granted Mr. Howe's motion for a directed verdict. The justice court dismissed the charge because prosecutors presented "no evidence" Mr. Howe "knowingly or intentionally made . . . a false alarm."

## IV. MR. HOWE'S CIVIL SUIT

¶ 12 On June 25, 2004, Mr. Howe filed a notice of claim with Salt Lake City. In the eight-page notice, Mr. Howe presented a number of claims arising under the federal and state constitutions, as well as state law. A complaint was filed on April 7, 2005. In all, Mr. Howe lodged ten causes of action against five named parties—Salt Lake City; the Police Chief; the Assistant Police Chief; Sgt. Bryant; and Ms. Werner. Mr. Howe's ten claims consisted of: (1) false arrest/false imprisonment; (2) malicious prosecution; (3) violation of the Utah Citizen Participation in Government Act; (4) tortious interference with existing and prospective business relations;[1] (5) intentional infliction of emotional distress; (6) conspiracy to violate constitutional rights; (7) defamation; (8) negligence; (9) deprivation of federal constitutional rights

---

1. In the district court, Mr. Howe stipulated to the dismissal of this cause of action and it is not part of this appeal.

under 42 U.S.C. § 1983;[2] and (10) violations under the Utah Constitution.

¶ 13 The parties filed cross motions for summary judgment in the district court. Mr. Howe moved for partial summary judgment on the claims of false arrest and malicious prosecution,[3] arguing that the justice court's finding that Salt Lake City presented "no evidence" of Mr. Howe's intent to violate the false-alarm statute conclusively established that the city lacked probable cause to arrest and charge Mr. Howe. Alternatively, Mr. Howe argued that the surrounding circumstances proved Sgt. Bryant lacked probable cause. The district court denied the motion, holding Mr. Howe had failed to prove that the facts known to Sgt. Bryant could not cause a prudent officer to believe an offense had occurred.

¶ 14 The district court then turned its attention to the motion for summary judgment filed by Salt Lake City. First, Salt Lake City argued for summary judgment on Mr. Howe's state claims based on procedural grounds under the UGIA. The district court granted the motion and dismissed all but one of Mr. Howe's state claims under the UGIA's procedural mandates.[4] Second, Salt Lake City attacked Mr. Howe's claims arising under 42 U.S.C. § 1983. Again, the district court dismissed all of these claims on the basis of qualified immunity, pleading defects, and the law of respondeat superior and supervisor liability in civil rights cases.

2. By the time the district court considered the motions for summary judgment at issue in this appeal, Mr. Howe's § 1983 claims had evolved into eight independent claims arising under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

3. Mr. Howe also moved for summary judgment on the claims under § 1983. The district court tacitly rejected that motion by granting Salt Lake City's motion for summary judgment and holding the defendants were entitled to qualified immunity under § 1983.

4. In its order, the district court dismissed Mr. Howe's action arising under the Utah Constitution as part of a UGIA analysis. The court's order, however, addressed the merits of this constitutional claim and does not merely dismiss on

¶ 15 Mr. Howe has appealed the district court's decisions on these motions. This court has jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008).

## ANALYSIS

¶ 16 A grant of summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). "When reviewing a grant of summary judgment, 'we evaluate the evidence and all reasonable inferences fairly drawn from that evidence in a light most favorable to the party opposing summary judgment.'"[5] *Fishbaugh v. Utah Power & Light,* 969 P.2d 403, 405 (Utah 1998) (quoting *Bowen v. Riverton City,* 656 P.2d 434, 436 (Utah 1982)). We review legal questions for correctness, granting the district court no deference. *S. Utah Wilderness Alliance v. Automated Geographic Reference Ctr.,* 2008 UT 88, ¶ 12, 200 P.3d 643.

## I. THE DIRECTED VERDICT IS NOT CONCLUSIVE EVIDENCE AND THE TOTALITY OF EVIDENCE FAILS TO SHOW A LACK OF PROBABLE CAUSE AS A MATTER OF LAW; THE DISTRICT COURT CORRECTLY DENIED MR. HOWE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

¶ 17 Mr. Howe argues he is entitled to a grant of summary judgment on his false

immunity grounds. Mr. Howe failed to address the merits of this claim in his appeal. Under rule 24(a)(9) of the Utah Rules of Appellate Procedure, Mr. Howe therefore waived this claim and we do not consider it as part of this appeal. *See Allen v. Friel,* 2008 UT 56, ¶ 7, 194 P.3d 903 ("If an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision.").

5. A motion for summary judgment on qualified immunity requires application of "special rules" regarding which party has the burden of persuasion and how the reviewing court views the evidence. *Reynolds v. Powell,* 370 F.3d 1028, 1030–31 (10th Cir.2004). For clarity, we discuss this standard in Part III before undertaking an analysis of qualified immunity.

arrest and malicious prosecution claims because Sgt. Bryant and Ms. Werner lacked probable cause to arrest Mr. Howe and have him prosecuted. Specifically, Mr. Howe urges us to find error in the district court's evaluation of probable cause leading to Sgt. Bryant's decision to cite and have Mr. Howe prosecuted for making a false alarm. Mr. Howe's argument takes two forms. First, he contends that the justice court's directed verdict in the criminal case obligated the district court in this case to grant his motion under principles of collateral estoppel. Second, he argues that the directed verdict, coupled with the surrounding circumstances, mandates summary judgment in his favor. We disagree.

### A. The Justice Court's "No Evidence" Finding Is Evidence of a Lack of Probable Cause, But Is Not Conclusive Evidence That Mandates Collateral Estoppel

¶ 18 At oral argument, Mr. Howe's principal argument was that he was entitled to summary judgment solely because Salt Lake City should be collaterally estopped from contesting whether its employees had probable cause to arrest and prosecute him. The exclusive basis of this claim was that despite the opportunity and motivation to introduce evidence showing Mr. Howe knowingly made a false alarm at the criminal trial, Salt Lake City presented "no evidence" of Mr. Howe's criminal intent. Mr. Howe asserts Salt Lake City's inability to present any evidence on his intent to make a false alarm in the justice court is conclusive evidence that Sgt. Bryant and Ms. Werner lacked probable cause to arrest and prosecute him.

■ ¶ 19 Mr. Howe's argument overlooks the differences in proof required in criminal and civil proceedings. In every criminal case, the law places the burden of proof on the prosecution to prove every element of the charged offense beyond a reasonable doubt. Utah Code Ann. § 76–1–501(1) (2008). In contrast, to prevail in his civil litigation, Mr. Howe must prove by a preponderance of the

evidence that Sgt. Bryant and Ms. Werner acted without probable cause. *See Johns v. Shulsen,* 717 P.2d 1336, 1338 (Utah 1986) ("It is universally recognized that the standard of proof in civil actions is by a preponderance of the evidence.").

■ ¶ 20 Our legal system turns on what level of proof is required and what party bears that burden. There is significant distance between the burdens imposed in the criminal context and the civil setting. That distance matters. "[T]he failure of the State to prove the elements of the charged crime beyond a reasonable doubt cannot logically estop another fact finder ... from finding that those same elements were proven by a preponderance of the evidence." *Id.* (holding an acquittal in a criminal case cannot preclude a finding that the same individual violated his parole because a parole hearing is a civil action).

■ ¶ 21 Mr. Howe, however, contends the burden of proof is immaterial here because the justice court found Salt Lake City failed to present *any* evidence that Mr. Howe knowingly made a false alarm. This argument misses the point. Although Salt Lake City prosecutors were unable to present evidence at trial on the mens rea element of the charged offense, the justice court's finding says nothing about the state of the evidence at the time Sgt. Bryant elected to issue Mr. Howe the citation. The law recognizes that facts, evidence, and inferences made at the time of arrest or in the initial stages of a prosecution may change or even disappear as a case proceeds to trial. *See State v. Standiford,* 769 P.2d 254, 266–67 (Utah 1988) ("[S]ometimes expected evidence just does not materialize."). A result in favor of a defendant in a criminal trial—at whatever stage of the proceeding—does not translate into an automatic conclusion that the arresting officers and the prosecuting attorneys lacked probable cause to proceed against a defendant at the outset. *See State v. Trane,* 2002 UT 97, ¶ 26, 57 P.3d 1052 ("[A] suspect does not need to be guilty of the offense for which the officers arrested the suspect for

the officers to have probable cause to arrest.").

¶ 22 We are therefore unpersuaded by Mr. Howe's argument that the justice court's decision should estop Salt Lake City from arguing that probable cause existed to arrest and prosecute him. The outcome in the criminal case, standing alone, is not conclusive evidence demanding the application of collateral estoppel. It is, at best, some evidence of a lack of probable cause for an arrest or prosecution that should be considered as part of a larger analysis of the totality of the circumstances.[6] *See Olson v. Indep. Order of Foresters,* 7 Utah 2d 322, 324 P.2d 1012, 1014–15 (1958). Thus, the district court correctly rejected Mr. Howe's motion for summary judgment on the sole basis of the justice court's directed verdict.

B. *When the Facts Are Taken in Their Entirety and in a Light Most Favorable to the Defendants, Mr. Howe Failed to Prove Sgt. Bryant Acted Without Probable Cause*

■ ¶ 23 Given that the justice court's decision is not conclusive evidence of a lack of probable cause, we turn to Mr. Howe's alternative argument that no probable cause existed under the totality of the circumstances as a matter of law. Probable cause is often the critical issue in litigation involving false arrest and malicious prosecution. *See Terry v. Zions Coop. Mercantile Inst.,* 605 P.2d 314, 320 (Utah 1979) (stating probable cause is a defense to a claim of false arrest or imprisonment), *overruled on other grounds by McFarland v. Skaggs,* 678 P.2d 298, 304–05 (Utah 1984); *Callioux v. Progressive Ins. Co.,* 745 P.2d 838, 843 (Utah Ct.App.1987) (holding a plaintiff must demonstrate a want of probable cause to prevail on a claim of malicious prosecution). The probable cause standard is constant regardless of the point at which it is required by the law. *See State v. Virgin,* 2006 UT 29, ¶ 18, 137 P.3d 787 (stating "probable cause means probable

cause" and specifically holding that probable cause mandated at a preliminary hearing is the same as that required for an arrest warrant).

■ ¶ 24 Given this consistency, our description of probable cause justifying an arrest and prosecution mirrors the standard derived from the Fourth Amendment. *See Trane,* 2002 UT 97, ¶¶ 26–27, 57 P.3d 1052 (holding that both the Utah Constitution and the Fourth Amendment of the U.S. Constitution require probable cause to support a warrantless arrest and defining probable cause with reference to federal jurisprudence). Thus, probable cause to effectuate an arrest requires that we objectively review the actions by police by asking " 'whether from the facts known to the officer, and the inferences [that can] fairly ... be drawn therefrom, a reasonable and prudent person in [the officer's] position would be justified in believing that the suspect had committed the offense.' " *Id.* ¶ 27 (quoting *State v. Cole,* 674 P.2d 119, 125 (Utah 1983) (alterations in original)). Therefore, we must determine whether the facts known to Sgt. Bryant and Ms. Werner, along with any fair inferences that may be derived from them, would lead a " 'reasonable and prudent person in the officer's position' " to be " 'justified in believing that the suspect had committed the offense.' " *Id.* (quoting *Cole,* 674 P.2d at 125 (alterations omitted)). Stated differently, to prevail on his motion Mr. Howe must demonstrate that it was unreasonable for Sgt. Bryant and Ms. Werner to conclude he violated state law by making a false alarm.

¶ 25 Utah's false alarm statute renders a person criminally liable for making a false alarm by reporting a crime or catastrophe while "knowing that the report or warning is false or baseless." Utah Code Ann. § 76–9–105(1). When Mr. Howe called police on June 27, 2003, he falsely reported that a private security guard was at the school and

---

6. While we note that the justice court's ruling may be "some evidence" of a lack of probable cause, we express no opinion on whether this evidence is admissible in any particular proceeding.

had verified a burglary. Mr. Howe, however, argues that this false statement is not equivalent to a false alarm contemplated in section 76–9–105; he points out that he did not report a false alarm, as a burglary had in fact occurred. Mr. Howe merely reported—albeit falsely—who had verified the crime. This argument is not without merit. The false alarm statute does not stand for the proposition that a person is subject to criminal prosecution by making any factual misstatements when they call for police assistance. Rather, section 76–9–105 clearly criminalizes the act of reporting a crime with the knowledge that no crime existed.

¶ 26 Nonetheless, other facts in this case raise questions with regard to probable cause. Mr. Howe told police dispatch that a security guard had verified the burglary. He knew that police would not otherwise respond. From his lobbying activities, Mr. Howe knew the content of the Salt Lake City ordinance. And Mr. Howe's own employee had been told by a police dispatcher, minutes earlier, that police would not respond to unverified burglar alarms by an alarm company. Additionally, Mr. Howe's own "whatever it takes" statement could be interpreted by a prudent officer as meaning that Mr. Howe would say anything necessary to persuade police to respond to a mere burglary alarm regardless of whether he believed an actual burglary had occurred. Finally, there are inconsistencies in Mr. Howe's initial statements. Mr. Howe told police dispatch that there was a burglary in progress. By the time Mr. Howe was interviewed by police, he claimed he was reporting a "panic alarm" based on a theory that "someone's life could potentially be in danger." Given these facts, we cannot conclude as a matter of law that a prudent officer would not have been justified in concluding Mr. Howe reported a crime while knowing it was false.

¶ 27 This does not mean there are no facts suggesting Sgt. Bryant and Ms. Werner act-

ed without probable cause. Indeed, in Part III we discuss these facts thoroughly. But, given that we must view the facts in a light most favorable to Salt Lake City—the non-moving party on this motion—we conclude the district court did not err in rejecting Mr. Howe's motion for partial summary judgment.

## II. THE DISTRICT COURT ERRED WHEN IT DISMISSED MR. HOWE'S CLAIMS ON PROCEDURAL GROUNDS ARISING UNDER THE UTAH GOVERNMENTAL IMMUNITY ACT

¶ 28 Mr. Howe next argues that the district court misapplied the procedural requirements of the UGIA to dismiss his state claims. Specifically, Mr. Howe argues the district court erred when it held (1) Mr. Howe failed to sufficiently plead that Sgt. Bryant or Ms. Werner acted with fraud or malice, and (2) Mr. Howe failed to file a sufficiently pled notice of claim within the statutorily mandated time period required by the UGIA.

### A. Mr. Howe's Notice of Claim Included Sufficient Allegations that the Government Employees Acted with Fraud or Malice

¶ 29 Generally, the UGIA operates to shield government employees from liability for tortious acts that occur during the course of employment. *See Mecham v. Frazier*, 2008 UT 60, ¶ 14, 193 P.3d 630. This does not mean government employees can never be sued in the face of the UGIA. To avoid immunity, a plaintiff must bring suit pursuant to an exception to the UGIA's general grant of immunity. *See id.* ¶ 15. Mr. Howe invokes the exception that abrogates immunity for government employees who act with "fraud or malice." Utah Code Ann. § 63–30–4 (1997).[7] Under the UGIA's man-

---

7. In 2004, the Utah Legislature repealed the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38 (1997) and re-enacted the statutory scheme as the Governmental Immu-

nity Act of Utah. *Id.* §§ 63–30d–101 to –904 (2004). Our citations here will be to the former statute because the former enactment was in effect at the time of Mr. Howe's alleged injuries.

datory notice-of-claim provision, a claimant wishing to use this exception must reasonably alert the governmental entity employing the alleged tortfeasor that the claims are based on employee fraud or malice. *See id.* § 63–30–4(3)(b); *Mecham,* 2008 UT 60, ¶ 19, 193 P.3d 630 (stating that to reasonably alert the governmental entity of a claim against one of its employees, the claim must be "due to the employee's fraudulent or malicious conduct").

¶ 30 The UGIA's notice-of-claim requirement does not demand "that such notices meet the standards required to state a claim for relief." *Houghton v. Dep't of Health,* 2005 UT 63, ¶ 21, 125 P.3d 860 (internal quotation marks omitted). In *Mecham,* this court held claimants need not specifically use the words "fraud" or "malice" to satisfy this immunity exception. 2008 UT 60, ¶ 19, 193 P.3d 630. "Whether a notice of claim contains an allegation of fraud or malice depends on the content of the notice as a whole." *Id.* ¶ 20.

¶ 31 Mr. Howe delivered an eight-page notice of claim to the Salt Lake City recorder on June 25, 2004. The district court found this notice of claim failed to assert any claims of fraud or malice and made only "general conclusory statements." We disagree with this characterization. Mr. Howe's notice of claim provided facts alleging malice by Ms. Werner and Sgt. Bryant. For instance, Mr. Howe alleged that Sgt. Bryant lacked facts to support a "good faith" arrest of Mr. Howe. Also, Mr. Howe asserted the purpose of the prosecution was not to bring a criminal to justice but to punish Mr. Howe for his public opposition to Salt Lake City's verified response policy. Moreover, Mr. Howe employed the term malice in his notice of claim when he alleged Salt Lake City acted "for the purpose of harassing, intimidating, punishing, or otherwise *maliciously* inhibiting" Mr. Howe's constitutional rights. (Emphasis added.) Finally, Mr. Howe alleged that Ms. Werner, with the support of her supervisors, "mounted a wideranging and public campaign

that features exaggerated, misleading and/or false statements against the alarm industry itself and individuals within the industry."

¶ 32 These claims were sufficient to alert Salt Lake City that Mr. Howe intended to bring claims against the police department's employees on the basis of malicious conduct within the scope of employment. Therefore, the district court erred in holding that Mr. Howe failed to allege fraud or malice in his June 25, 2004 notice of claim filed with Salt Lake City.

*B. Mr. Howe Filed His Notice of Claim Within the Period Mandated by the Utah Governmental Immunity Act*

¶ 33 In addition to meeting one of the UGIA's exceptions that nullifies immunity, a claimant must file the notice of claim "within one year after the claim arises." Utah Code Ann. § 63–30–12 (1997). The district court held that Mr. Howe's notice of claim was statutorily untimely under the UGIA. However, the district court used the date Mr. Howe filed his complaint in Third District Court—April 7, 2005—rather than the date he filed his notice of claim—June 25, 2004—as the date of notice of his claims against city employees. The district court's use of the later date is understandable given its conclusion that Mr. Howe's June 25, 2004 notice of claim did not sufficiently allege fraud or malice. Having found Mr. Howe's notice of claim insufficient, the court used the next document that could satisfy the UGIA's notice-of-claim requirement. That document was Mr. Howe's complaint, which was filed outside of the UGIA's one-year mandate.

¶ 34 Given our holding that Mr. Howe's notice of claim sufficiently alleged malice on the part of Ms. Werner and Sgt. Bryant, the proper date from which to apply the UGIA's one-year statute of limitations is the earlier date of June 25, 2004. Therefore, to be timely under the UGIA, Mr. Howe's claim must have arisen within the single year preceding the June 25, 2004 filing. All of the events giving rise to Mr. Howe's claims occurred within one year of that date.

*See Peck v. State,* 2008 UT 39, ¶ 1 n. 1, 191 P.3d 4.

¶ 35 Mr. Howe's notice was timely under the UGIA. We therefore reverse the district court's grant of Salt Lake City's motion for summary judgment under the UGIA and remand Mr. Howe's state claims[8] to the district court.

## III. MR. HOWE'S UNLAWFUL SEIZURE CLAIM SURVIVES QUALIFIED IMMUNITY, BUT THE DISTRICT COURT PROPERLY DISMISSED HIS REMAINING § 1983 CLAIMS

■ ¶ 36 Congress enacted 42 U.S.C. § 1983 " 'to protect the people from unconstitutional action under color of state law.' " *Patsy v. Bd. of Regents*, 457 U.S. 496, 503, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972)). Section 1983 creates a "federal cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution.' " *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 755, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (quoting 42 U.S.C. § 1983 (2006)). Mr. Howe used § 1983 as a basis for eight independent claims alleging civil rights violations under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. Mr. Howe's complaint provides generalized allegations supporting his § 1983 causes of action but does not provide an explicit list of what claims he intended to bring under the federal constitution. We identify eight claims that were briefed and argued in the district court on summary judgment. Those actions are (1) a Fourth Amendment seizure

claim, (2) a Fourth Amendment malicious prosecution claim, (3) a Fourteenth Amendment substantive due process claim, (4) a First Amendment retaliation claim, (5) a Fourteenth Amendment stigma plus claim,[9] (6) a First Amendment nonretaliation claim, (7) a claim against Salt Lake City under a theory of respondeat superior, and (8) a claim against the former Police Chief and the Assistant Police Chief for supervisor liability.

¶ 37 The district court dismissed each of Mr. Howe's § 1983 claims. For clarity, we divide these claims into three categories. First, we analyze the claims dismissed under the doctrine of qualified immunity. Second, we address the claims dismissed for insufficient pleading. Finally, we conclude with a discussion of the claims against Sgt. Bryant's and Ms. Werner's supervisors and Salt Lake City.[10]

### A. Qualified Immunity

¶ 38 While the text of § 1983 is silent on the issue of immunity, courts recognize two distinct forms of governmental immunity arising under federal law. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In this appeal we are only concerned with qualified immunity and its application to Ms. Werner and Sgt. Bryant.

■ ¶ 39 Generally, public employees are entitled to the protection of qualified immunity because the doctrine "represents the norm" for government employees. *Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (internal quota-

---

8. Those causes of action are (1) false arrest/imprisonment, (2) malicious prosecution, (3) violation of the Citizens Participation in Government Act, (4) defamation, (5) intentional infliction of emotional distress, (6) conspiracy, and (7) negligence.

9. A stigma plus cause of action is based in part on alleged defamatory statements that cause damage to one's reputation. To arise to a claim covered by § 1983, a plaintiff must show "stigma to his reputation *plus* deprivation of some additional right or interest." *Dee v. Borough of Dun-*

*more*, 549 F.3d 225, 233–34 (3d Cir.2008). Thus the name stigma plus.

10. We do not consider Mr. Howe's First Amendment retaliation claim because he failed to address that claim on appeal. An appellant waives a claim by failing to provide the appellate panel with "contentions and reasons" supporting a reversal of the lower court. Utah R.App. P. 24(a)(9); *Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903 ("If an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision.").

tion marks omitted). Qualified immunity does not operate merely as a defense to liability; it is a shield from suit. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Indeed, "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that ' "insubstantial claims" against government officials [will] be resolved prior to discovery.' " *Pearson v. Callahan*, 555 U.S. 223, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The doctrine of qualified immunity operates by insulating government employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

 ¶ 40 Whether a government official is entitled to qualified immunity turns on a two-part analysis. *See Pearson*, 129 S.Ct. at 815–16. In the first part of this test,[11] the reviewing court is required to determine whether the facts, as alleged by the plaintiff, "make out a violation of a constitutional right." *Id.* In other words, the court must ask what is the constitutional right at stake and whether the facts support a claim that the right was violated. In the second part, the court must determine if the alleged right was "clearly established at the time" of the government official's alleged misconduct. *Id.* at 816 (internal quotation marks omitted).

 ¶ 41 In analyzing qualified immunity a court must apply "special rules" involving the burden of proof on summary judgment. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir.2004) (internal quotation marks omitted). Generally, the moving party on a motion for summary judgment has

the burden to prove that it is entitled to judgment as a matter of law, and the court evaluates the evidence and reasonable inferences in a light most favorable to the nonmoving party. Utah R. Civ. P. 56(c); *Fishbaugh v. Utah Power & Light*, 969 P.2d 403, 405 (Utah 1998). Under qualified immunity the court still views the evidence in a light most favorable to the nonmoving party. *See Reynolds*, 370 F.3d at 1030–31. In contrast to the general rule of procedure, once a defendant claims qualified immunity, the plaintiff always has the burden of proving that immunity is improper under the two-part test. *See Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir.2007) (en banc). Thus, the plaintiff must (1) demonstrate that the facts alleged make out a violation of a constitutional right and (2) prove the right was clearly established at the time of the purported violation. Plaintiffs are not required to prove they are entitled to win at this point. Rather, the reviewing court considers whether the facts alleged, if true, would amount to a constitutional violation clearly established at the time of the alleged misconduct. *See Reynolds*, 370 F.3d at 1030 ("As a threshold matter, plaintiff must therefore demonstrate that he has presented sufficient facts to show that defendants' conduct violated [a constitutional right].").

¶ 42 The district court in this case dismissed four of Mr. Howe's § 1983 claims under qualified immunity. Those claims are (1) unlawful seizure, (2) malicious prosecution, (3) violation of substantive due process, and (4) First Amendment retaliation. With the exclusion of Mr. Howe's retaliation claim, which he failed to raise on appeal, we discuss each of these claims separately.

**1. Sgt. Bryant and Ms. Werner Are Not Entitled to Qualified Immunity on Mr. Howe's § 1983 Seizure Claim**

 ¶ 43 The district court dismissed Mr. Howe's § 1983 unlawful seizure claim, hold-

---

**11.** Until early 2009, the Supreme Court mandated the two-part test be conducted sequentially. *Pearson*, 129 S.Ct. at 815–16. In *Pearson*, the Supreme Court reaffirmed the two-part analysis but held that trial courts were no longer required

to strictly comply with the sequential analysis. *Id.* at 818 (stating judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").

ing the government employees were entitled to qualified immunity because Mr. Howe failed to show the actions of Sgt. Bryant and Ms. Werner amounted to a violation of his Fourth Amendment right against unreasonable seizure. First, the district court found that Mr. Howe was not seized within the meaning of the Fourth Amendment. Second, the district court found that, even if a seizure occurred, Mr. Howe failed to show Sgt. Bryant and Ms. Werner acted without probable cause.

¶ 44 We must first determine whether the actions by the police on June 27, 2003, constituted a seizure, and, if so, whether the seizure was unreasonable. *See Fuerschbach v. Sw. Airlines Co.,* 439 F.3d 1197, 1202 (10th Cir.2006). The gravamen of a Fourth Amendment seizure is whether "a reasonable person would have believed that he was not free to leave" under all of the surrounding circumstances. *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (internal quotation marks omitted); *see also Reeves v. Churchich,* 484 F.3d 1244, 1259 (10th Cir.2007) ("A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the encounter, a reasonable person would have believed he was not free to leave, decline the officers' requests or otherwise terminate the encounter.").

¶ 45 In determining that Mr. Howe was not subject to a seizure, the district court referenced *Martinez v. Carr.* In that case, the Tenth Circuit Court of Appeals considered whether the issuance of a misdemeanor citation alone amounts to a seizure under the Fourth Amendment. *Martinez v. Carr,* 479 F.3d 1292, 1295 (10th Cir.2007). In *Martinez,* a number of police officers seized the plaintiff by initially detaining him, physically restraining him, and escorting him to a "police post." *Id.* Another officer, who played no role in the initial seizure of the plaintiff, issued the plaintiff a citation and released him from detention. *Id.* The plaintiff brought a § 1983 action against the offi-

cer who issued the citation, but not against any of the officers involved in the initial seizure. *Id.* The basis for a seizure by the defendant officer was the fact that he issued the plaintiff a citation under a threat that the plaintiff would be formally arrested if he refused to accept the citation. The Tenth Circuit held the citation was a release from detention and could not be construed as an independent seizure. *See id.* at 1296 ("[T]he upshot of the officer's actions was that the defendant was given the freedom to choose not to be arrested and instead leave without any restrictions on his movement." (emphasis omitted)). Thus, *Martinez* stands for the proposition that the lawful issuance of a citation, standing alone, cannot constitute an independent seizure. *Martinez,* however, does not stand for the proposition that the issuance of a citation vitiates the effect of any preceding seizure. *See id.* at 1295 (stating it is undisputed that other officers seized the plaintiff but the plaintiff failed to bring an action against those officers).

¶ 46 In this case, Mr. Howe relies on the circumstances surrounding the issuance of the citation as a basis for his seizure claim. While we agree with the district court that Sgt. Bryant did not seize Mr. Howe simply by issuing the citation, we believe that there are facts to support a conclusion that he did seize Mr. Howe briefly before issuing the citation. The defendants do not dispute that, upon summoning Mr. Howe to the Peak Alarm lobby, Sgt. Bryant told Mr. Howe that he intended to "arrest" him. There is some dispute in the record about what occurred next. Sgt. Bryant claims to have immediately told Mr. Howe that he would be released on a citation "if that was his preference." Mr. Howe claims Sgt. Bryant repeated the statement and the two began arguing about the merits of the citation before Sgt. Bryant told him that he could avoid going to jail by signing a citation. Since we must take the facts as alleged by Mr. Howe as true at this stage, we conclude that those facts support a claim that Sgt. Bryant seized Mr. Howe for a brief period before beginning the process of issuing Mr. Howe a citation. No reasonable

person would believe he was free to leave after an officer states he intends to arrest him. Indeed, Sgt. Bryant stated Mr. Howe was not free to leave during the July 27 exchange and, had Mr. Howe attempted to leave, it is likely Sgt. Bryant would have arrested him.

¶ 47 Accordingly, Mr. Howe has alleged facts that support a claim that Sgt. Bryant violated his constitutional right to be free from an unreasonable seizure. Thus, the district court incorrectly determined that no seizure occurred on June 27. This showing, however, is sufficient only to satisfy the first part of the qualified-immunity test as we do not decide Mr. Howe's seizure claim as a matter of law. Whether Mr. Howe was seized is a factual question that must be resolved in the district court.

■ ¶ 48 This does not conclude our analysis of whether Mr. Howe successfully made out a violation of a constitutional right under qualified immunity. We must also consider whether the seizure was unreasonable or, in other words, whether Mr. Howe provided sufficient facts to demonstrate Sgt. Bryant lacked probable cause for the arrest. If probable cause existed, then the seizure was reasonable; if not, the seizure was unreasonable and exceeded constitutional bounds. *See Herring v. United States*, 555 U.S. 135, ——, 129 S.Ct. 695, 698, 172 L.Ed.2d 496 (2009) (stating that the Fourth Amendment generally requires police to have probable cause to make an arrest); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) ("[W]hen a warrantless arrest is the subject of a § 1983 action, . . . a plaintiff must prove that the officer(s) lacked probable cause.").

■ ¶ 49 "Probable cause is based on the totality of circumstances" and employs an objective test questioning whether a reasonable officer would believe the arrested individual has committed a crime. *Cortez*, 478 F.3d at 1116. Indeed, " '[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed.' " *Buck*, 549 F.3d at 1281 (quoting *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)); *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

¶ 50 Thus, the question here is whether a reasonable officer—operating under the facts facing Sgt. Bryant at the time—would have seized Mr. Howe. Sgt. Bryant found two statements by Mr. Howe critical in reaching his decision to charge Mr. Howe with making a false alarm. First, Mr. Howe falsely stated that a private security guard had verified a burglary at the school. Second, Mr. Howe stated, "[w]hatever it takes, I thought it was a panic alarm." These two statements, however, are only part of the totality of the circumstances.

¶ 51 Other circumstances demonstrate that the statements about the security guard's purported presence at the school were the product of an incorrect assumption on Mr. Howe's part, not a knowing misrepresentation. Tellingly, within minutes of Mr. Howe's initial call to police, he expressly informed a police dispatcher that the information about the security guard had been incorrect.

■ ¶ 52 Moreover, to determine whether probable cause existed under the totality of these circumstances, the statute Sgt. Bryant used to cite Mr. Howe must be considered.[12] The false alarm statute imposes criminal liability when (1) an individual reports a crime, (2) the individual knows the

---

12. In evaluating an unlawful seizure claim under § 1983, courts must consider which crimes the police "could objectively and reasonably have believed [the plaintiff] committed." *Fogarty*, 523 F.3d at 1156. (Evaluating whether police had probable cause to seize a protestor for disorderly conduct when the protestor was never charged with an offense). Considering potential, uncharged offenses is logical when the alleged criminal activity and arrest occur within a nar-

row time frame because the court is asking whether a reasonable officer would have made an arrest under the circumstances. We do not believe, and the parties here have not argued, that it is necessary to consider other crimes Mr. Howe could have been charged with. In this case, nearly a month passed between the time Mr. Howe summoned police to West High School and when Sgt. Bryant cited and allegedly seized Mr. Howe for making a false alarm. Ad-

report is false or baseless, and (3) the individual knows the report will prompt action by police. Utah Code Ann. § 76–9–105(1) (2008). There can be no doubt—and therefore it was reasonable for Sgt. Bryant to conclude—Mr. Howe meets the first and third elements of this statute. After all, Mr. Howe reported a burglary in progress and the point of Mr. Howe's call was to prompt police to respond.

¶ 53 Whether Mr. Howe knew his report to police dispatch on June 27, 2003, was false or baseless is a much closer question. The plain language of Utah's false alarm statute criminalizes the acts of those who report a crime with knowledge that the report (of the crime) is false or baseless. *Id.* This statute does not criminalize mere false statements. As an illustration, the statute criminalizes the actions of a homeowner who reports a fire while knowing no fire exists. In contrast, we cannot read the statute to reach a homeowner who calls in a fire but reports that the fire's origin was in the kitchen when it in fact started in a different room. Although the homeowner makes a false statement in the latter example, police would lack probable cause to arrest for making a false alarm because the homeowner did not make the call knowing the report of a fire was false or baseless. The linchpin to criminal culpability under Utah Code section 76–9–105 is the caller's subjective knowledge that the report is false or baseless as to the existence of a crime. Taking the facts presented by Mr. Howe as true, as we must, we conclude that they tend to show he believed a burglary was occurring at West High School.

¶ 54 Our decision here, as it was in Part I, is largely conditioned on the burden imposed under the analysis. Unlike Part I, we must accept the facts as presented by Mr. Howe as true in this part of our analysis. *See Fuerschbach,* 439 F.3d at 1203 ("When reviewing an assertion of qualified immunity . . . we are bound to take the plaintiff's allegations as true."). Mr. Howe has claimed,

and has presented supporting facts, that he subjectively believed a burglary occurred at the school, and relayed that information to police. Sgt. Bryant and Ms. Werner simply disregarded this construction of the facts known to them. When Mr. Howe attempted to contact Ms. Werner directly to explain the events of June 27, 2003, she refused to respond, stating she did not need to listen to Mr. Howe's "rationalization and justification." We believe the facts alleged by Mr. Howe raise at least a jury question on the lack of probable cause and, therefore, make out a constitutional violation of Mr. Howe's right to be free from unreasonable seizure sufficient to survive qualified immunity.

¶ 55 We now consider the second prong of the qualified immunity test: whether Mr. Howe's right to be free from unreasonable seizure was clearly established at the time of the alleged unlawful conduct. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented." *Buck,* 549 F.3d at 1286 (internal quotation marks omitted). The jurisprudence surrounding the Fourth Amendment right against unlawful seizure "was and is unambiguous: a government official must have probable cause to arrest an individual." *Cortez,* 478 F.3d at 1117. Thus, a reasonable officer knows that it is unlawful to arrest an individual without probable cause. Again accepting Mr. Howe's facts as true, we find Sgt. Bryant detained Mr. Howe without probable cause. Lacking probable cause, the seizure of Mr. Howe was a violation of a clearly established right. *See Buck,* 549 F.3d at 1286–87.

¶ 56 In sum, Mr. Howe has presented facts that tend to show Sgt. Bryant violated his Fourth Amendment right to be free from unreasonable seizure, a right clearly established at the time of Sgt. Bryant's alleged misconduct. Thus, the district court erred

---

ditionally, Sgt. Bryant and Ms. Werner specifically rejected charging Mr. Howe under Salt Lake City's verified response ordinance and believed the false alarm statute was the only possible charge that could be brought.

when it dismissed Mr. Howe's unreasonable seizure claim under qualified immunity.

### 2. Sgt. Bryant and Ms. Werner Are Entitled to Qualified Immunity on Mr. Howe's Malicious Prosecution Claim

¶ 57 Under federal jurisprudence, a § 1983 malicious prosecution claim lies within the protections provided in either the Fourth or Fourteenth Amendments. "The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause." *Pierce v. Gilchrist,* 359 F.3d 1279, 1285–86 (10th Cir.2004) (citation omitted). In this appeal, Mr. Howe limits his malicious prosecution claim to the Fourth Amendment and disavows any connection to the due process protections of the Fourteenth Amendment. Thus, we restrict our analysis to the Fourth Amendment.

¶ 58 A malicious prosecution action based in the Fourth Amendment requires a seizure pursuant to legal process or some interference with individual liberties. "A groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty." *Becker v. Kroll,* 494 F.3d 904, 915 (10th Cir.2007); *see also Nielander v. Bd. of Cnty. Comm'rs,* 582 F.3d 1155, 1164–65 (10th Cir. 2009) (stating a plaintiff "must prove that he was also seized in order to prevail" on a malicious prosecution claim based on the Fourth Amendment).

¶ 59 What complicates this analysis is that a detention giving rise to a claim of unlawful seizure does not necessarily create a seizure for malicious prosecution purposes. *See Wilkins v. DeReyes,* 528 F.3d 790, 799 n. 5 (10th Cir.2008) (recognizing that a malicious prosecution claim is "a second Fourth Amendment claim" that comes "on the heels of" a false arrest or imprisonment claim). The line separating a cause of action for false arrest and one for malicious prosecution is

the "institution of legal process," *Id.* at 798; *see also Wallace v. Kato,* 549 U.S. 384, 389–90, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (distinguishing between false imprisonment, which "ends once the victim becomes held pursuant to such process," and the "entirely distinct tort of malicious prosecution," which is based on "wrongful institution of legal process" (emphasis and internal quotation marks omitted)). With this distinction in mind, federal courts have held a cause of action for malicious prosecution under the Fourth Amendment can only be maintained when the plaintiff is detained "after the wrongful institution of legal process." *Young v. Davis,* 554 F.3d 1254, 1257 (10th Cir.2009); *see also Wilkins,* 528 F.3d at 798; *McNally v. Colo. State Patrol,* 122 Fed.Appx. 899, 903 (10th Cir.2004) ("A malicious-prosecution suit ... 'permits damages for confinement imposed pursuant to legal process.' ") (quoting *Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)).

¶ 60 Hence, a malicious prosecution claim based on the Fourth Amendment is viewed as a seizure, as a consequence of the improper use of legal process. Therefore, as a threshold matter, Mr. Howe's malicious prosecution claim will not survive the first prong of the qualified immunity test if Mr. Howe failed to show he was detained after the institution of legal process in his false alarm prosecution. The brief detention Mr. Howe was subjected to before the issuance of the citation occurred before the initiation of any legal process. The only other fact giving rise to an inference of a seizure is the fact that Sgt. Bryant retained Mr. Howe's driver's license after issuing the citation. Mr. Howe has failed to present any facts contradicting the district court's holding that the retention of Mr. Howe's driver's license was inadvertent and caused no restriction on any of Mr. Howe's liberties.

¶ 61 Some federal courts have recognized a theory of continuing seizure as a constitutional violation in the absence of physical restraint. *See Penberth v. Krajnak,* 347 Fed. Appx. 827, 829 (3d Cir.2009). This theory was first advocated by Justice Ginsburg in

*Albright v. Oliver,* 510 U.S. 266, 278, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring), and is founded on the pretrial control the state exercises over an individual defendant. Such a seizure "for Fourth Amendment purposes include[s] requiring a person to post bond, compelling a person to appear in court, or imposing restrictions on a person's right to interstate travel." *Becker,* 494 F.3d at 915 (interpreting Justice Ginsburg's concurrence). Some circuits have expressly rejected continuing seizure as a means to pursue a malicious prosecution action under the Fourth Amendment. *See Nielander,* 582 F.3d at 1165. Even those courts that have adopted continuing seizure as a legally cognizable injury do so "only when criminal charges are coupled with another significant restraint on liberty, such as restrictions on travel." *Becker,* 494 F.3d at 916; *see also Bielanski v. Cnty. of Kane,* 550 F.3d 632, 638–42 (7th Cir.2008) (surveying treatment of continuing seizure by the circuits before rejecting the theory in the Seventh Circuit).

¶ 62 Even if we were to recognize the doctrine of continuing seizure, the facts in this case are inadequate to show such a seizure occurred. *See Penberth,* 347 Fed. Appx. at 829 (holding there was no seizure where the individual (1) was detained for forty minutes but not arrested, (2) "did not have to post bail [or] communicate with pretrial services," and (3) had no travel restrictions imposed (alteration in original)). Mr. Howe was momentarily detained. Mr. Howe was subject to no additional restrictions on his movement once the citation was issued. Therefore, Mr. Howe was subject to neither a continuing seizure nor a seizure pursuant to legal process that would support a claim of malicious prosecution under the Fourth Amendment. The district court did not err in finding that the individual defendants were entitled to qualified immunity on Mr. Howe's malicious prosecution action.

3. Sgt. Bryant and Ms. Werner Are Entitled to Qualified Immunity on Mr. Howe's Substantive Due Process Claim

██ ¶ 63 The district court also dismissed Mr. Howe's substantive due process claim,

holding that Mr. Howe had "failed to show any extreme conduct" by the defendants. Mr. Howe urges us to revive this claim under a theory that the defendants did not bring the false alarm charge against him because they believed he was guilty. Rather, Mr. Howe contends the charge was "intended to punish" him for his public opposition to Salt Lake City's verified response program and to silence other opposition from the private alarm sector. The district court dismissed Mr. Howe's substantive due process claim, holding that he had not alleged facts showing any conduct by Sgt. Bryant or Ms. Werner sufficient to make out a substantive due process violation as required by the first prong of the qualified immunity doctrine.

██ ¶ 64 It is well settled that the Fourteenth Amendment's protection of life, liberty, and property gives rise to substantive due process claims. *See Graves v. Thomas,* 450 F.3d 1215, 1220 (10th Cir.2006). "The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience" of the reviewing judge. *Moore v. Guthrie,* 438 F.3d 1036, 1040 (10th Cir.2006) (internal quotation marks omitted). The shock-the-conscience standard is purposefully vague and is intended to evolve over time. *See Livsey v. Salt Lake Cnty.,* 275 F.3d 952, 958 (10th Cir.2001). Federal courts, however, have provided a number of guideposts for this analysis. Ordinary negligence is never sufficient to shock the conscience. *Ruiz v. McDonnell,* 299 F.3d 1173, 1184 (10th Cir. 2002). Also insufficient are incorrect or ill-advised ... decisions. *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir.1995) (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Indeed,

"a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience

shocking. This is a high level of outrageousness."

*Ward v. Anderson,* 494 F.3d 929, 937–38 (10th Cir.2007).

¶ 65 Intentionally using criminal charges as an instrument to oppress opposition to government is well within the prohibitions considered part of substantive due process. *See Bell v. Johnson,* 308 F.3d 594, 608 (6th Cir.2002) (finding an 'egregious abuse of governmental power' when an inmate was framed and subjected to prolonged imprisonment as retaliation for his complaints about prison conditions). Thus, Mr. Howe's legal theory concerns conscience shocking behavior. Qualified immunity, however, requires Mr. Howe to support his cause of action with facts that make out a violation of a constitutional right. In the district court, as on appeal, Mr. Howe's entire argument on this point is:

> In this case, Plaintiffs have developed substantial evidence that would enable the jury to conclude that Defendants intended to punish Jeff Howe for his political speech, as [Ms.] Werner put it, to send 'a signal to other alarm companies.' Such motives are unjustifiable by any legitimate government interest and, therefore, shock the conscience.

This argument is merely a restatement of Mr. Howe's legal theory for his substantive due process claim and fails to identify any fact supporting his theory beyond Ms. Werner's statement, which contains no indication that the "message" in question had anything to do with prosecuting innocent people.

¶ 66 Moreover, Mr. Howe has taken Ms. Werner's statement out of context. Mr. Howe's abbreviated version of Ms. Werner's statement suggests Ms. Werner wanted to put the alarm industry on notice that opposition to the verified response program would be met by criminal penalties in Salt Lake City. Ms. Werner's complete statement provides an alternative interpretation. She stated, "I'm hoping for the enforcement of our

ordinance that it goes well. If the jury lets Peak Alarm off the hook, to me that's a signal to other alarm companies to call Salt Lake City police and tell them whatever they want." Ms. Werner's statement evidently goes to a concern about the message sent by the legal process as opposed to a message from the city to the alarm industry.

¶ 67 Mr. Howe has never provided any additional analysis drawing on other facts in the record that suggest the defendants targeted him as a means of oppressing opposition to the verified response program. This court has interpreted Utah Rule of Appellate Procedure 24(a)(9) to require appellants to present meaningful analysis because the appellate courts of this state are not depositories in which "the appealing party may dump the burden of argument and research." *State v. Jaeger,* 1999 UT 1, ¶ 31, 973 P.2d 404 (internal quotation marks omitted); *see also State v. Garner,* 2002 UT App 234, ¶ 12, 52 P.3d 467 ("When a party fails to offer any meaningful analysis regarding a claim, we decline to reach the merits."). Absent additional direction by Mr. Howe, we cannot conclude that the district court erred in finding he had failed to show the defendant's conduct shocked the conscience.

## B. Insufficient Pleading

¶ 68 The district court dismissed Mr. Howe's Fourteenth Amendment stigma plus claim and his First Amendment nonretaliation action on the basis that neither claim was sufficiently pled under Utah's notice pleading standard. Specifically, the district court found that Mr. Howe raised both of these claims for the first time in his pleading in opposition to Salt Lake City's motion for summary judgment.

¶ 69 "A plaintiff is required, under our liberal standard of notice pleading, to submit a 'short and plain statement ... showing that the pleader is entitled to relief' and 'a demand for judgment for the relief.' " *Canfield v. Layton City,* 2005 UT 60, ¶ 14, 122 P.3d 622 (quoting Utah R. Civ. P. 8(a)). The plaintiff must provide the defendant

"fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 970 (Utah 1982) (internal quotation marks omitted).

¶ 70 We have not previously had an opportunity to review how Utah's liberal pleading standard interacts with claims pled under § 1983. Claims sounding in § 1983 "pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir.2008). Despite the complex nature of these claims, the Federal Rules of Civil Procedure impose no heightened pleading standard for § 1983 actions. *See Leatherman v. Tarrant Cnty. Narcotics Intell. & Coord. Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (holding the federal rules only require a "short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (internal quotation marks omitted)). We think the federal conclusion is appropriate and therefore hold that the Utah Rules of Civil Procedure likewise do not impose a heightened pleading standard on claims sounding in § 1983.[13] Thus, all that is required of a plaintiff bringing a § 1983 cause of action is to give the defendants "fair notice" of the claims against them. *Williams*, 656 P.2d at 971.

¶ 71 Having settled the pleading requirement for a § 1983 claim under the Utah Rules of Civil Procedure, we turn to the merits of the district court's dismissal, first addressing Mr. Howe's nonretaliation claim and then his stigma plus action.

**1. Mr. Howe's Complaint Failed to Give Salt Lake City Notice of a Nonretaliation Claim Based on the First Amendment**

¶ 72 Mr. Howe asserts his First Amendment nonretaliation claim is based on a theory that Ms. Werner's statements about Peak Alarm and Mr. Howe were designed to suppress opposition to the verified response program. This claim is based on Ms. Werner's statements alone and is entirely independent of Mr. Howe's detention and prosecution.

¶ 73 Mr. Howe's Amended Complaint referenced the First Amendment. This reference and the adjoining allegations of this complaint put Salt Lake City on notice that Mr. Howe intended to bring a First Amendment retaliation claim under a theory that Sgt. Bryant detained and subjected Mr. Howe to prosecution as punishment for speaking publicly against the verified response program. At summary judgment, and on appeal, Mr. Howe attempted to create an entirely separate First Amendment claim based on Ms. Werner's alleged defamatory statements. We have serious doubts that the alleged defamation in this case can create a constitutional violation giving rise to a § 1983 action. *See Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (declining to create a cause of action under § 1983 "wherever the State may be characterized as the tortfeasor"). Moreover, we are unable to read Mr. Howe's Amended Complaint as giving Salt Lake City fair notice of a claim under the First Amendment based on Ms.

---

13. In 2007, the U.S. Supreme Court adopted a new pleading standard for cases arising under the Sherman Act, i.e., antitrust cases. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That standard requires plaintiffs to plead "only enough facts to state a claim to relief that is *plausible* on its face." *Id.* (emphasis added). While this plausibility standard arose within an antitrust case, some circuit courts of appeals have applied the plausibility standard to all civil cases arising under federal law. *See Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir.2008) (applying the plausibility standard to a plaintiff's claims arising in § 1983); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008) (same); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir.2007) (holding a complaint must allege facts that "actively and plausibly suggest" the defendant violated the law).

Our holding here is not an indication that we adopt the Supreme Court's plausibility standard. Our reference to the Federal Rules of Civil Procedure is only for the purpose of agreeing that § 1983 claims require no heightened pleading standard.

Werner's allegedly injurious statements. Thus, the trial court did not err in dismissing Mr. Howe's nonretaliation claim.

## 2. While Mr. Howe Adequately Pled His Stigma Plus Claim, the District Court Did Not Err by Dismissing the Claim Because Mr. Howe Pled the Action as a Substantive Due Process Violation

¶ 74 A stigma plus claim is based on the liberty protections found in the Fourteenth Amendment and is at issue when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (internal quotation marks omitted). A harm to one's reputation alone does not create a stigma plus violation. *See Paul v. Davis*, 424 U.S. at 701, 96 S.Ct. 1155. The plaintiff also must allege an injury to a liberty or property interest to invoke the protections of the Due Process Clause. *See id.* Thus, to prove a stigma plus violation, a plaintiff is required to show (1) the government made a "derogatory" and false statement designed to injure the plaintiff's reputation, and (2) the plaintiff "experienced some governmentally imposed burden that significantly altered his or her status as a matter of state law." *Gwinn*, 354 F.3d at 1216 (internal quotation marks and alteration omitted).

¶ 75 Mr. Howe's Amended Complaint alleges (1) Ms. Werner, with the authorization of the police department, engaged in a "campaign" of false statements aimed at maligning Peak Alarm and the entire alarm industry, and (2) these statements amounted to a government-imposed burden. Additionally, Mr. Howe stated this claim was based, in part, on a Fourteenth Amendment violation including a "deprivation of his liberty without due process of law." These allegations were sufficient to give Salt Lake City fair notice that Mr. Howe intended to bring a stigma plus claim under the Fourteenth Amendment.

¶ 76 Despite the adequate pleading by Mr. Howe, we affirm the district court's decision on an alternative ground. "It is well settled that an appellate court may affirm the judgment appealed from 'if it is sustainable on any legal ground or theory apparent on the record.'" *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225). In the district court, Mr. Howe presented his stigma plus action as a substantive due process claim. However, under federal law, stigma plus claims arise only within the procedural protections of the Due Process Clause. *See Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 502 (6th Cir.2007) ("Our review of the caselaw has failed to identify any case that applies the stigma-plus test to a substantive due process claim."); *Gwinn*, 354 F.3d at 1216 (stating government harm to one's reputation may give rise to a "protectible liberty interest ... that requires procedural due process") (internal quotation marks omitted); *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 402 n. 1 (3d Cir.2000) (stating that precedent in the circuit is against recognizing stigma plus as a substantive due process claim). Thus, we affirm the district court's decision to dismiss Mr. Howe's stigma plus claim because Mr. Howe has failed to show a violation of a constitutional right under a theory of stigma plus as a substantive due process claim.

### C. Supervisor Liability and Claims Against Salt Lake City

¶ 77 Up until this point, our analysis of Mr. Howe's § 1983 claims were those brought against Sgt. Bryant and Ms. Werner individually. Additionally, Mr. Howe attempted to render Salt Lake City liable for a pattern of tortious behavior by the two employees. Mr. Howe also brought a separate cause of action against the former Police Chief and the Assistant Police Chief on the basis of supervisor liability. The district court dismissed these claims. We address both of these actions individually, turning first to Salt Lake City's liability as a municipality.

## 1. The District Court Correctly Dismissed Mr. Howe's Claim Against Salt Lake City Because the City Lacked Constructive Notice Through a Pattern of Tortious Conduct

¶ 78 Municipalities may be held liable under § 1983 for civil rights violations.

*See Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (stating that "local governmental bodies are 'persons' within the meaning of § 1983"). In considering a revival of Mr. Howe's § 1983 action against Salt Lake City, however, we forgo an analysis of qualified immunity since the defense is unavailable to political subdivisions. *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir.2009).

¶ 79 Local governments may only be held liable under § 1983 for their "own unconstitutional or illegal policies" leading to an employee's tortious conduct. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). In other words, municipalities cannot be held liable under § 1983 pursuant to the traditional tort of respondeat superior. *See Brown*, 520 U.S. at 403, 117 S.Ct. 1382. The Supreme Court requires plaintiffs seeking to impose liability on a municipality "under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* A plaintiff may attack a municipal policy or custom in two ways. A plaintiff may attempt a facial attack on the local government's policy, alleging the policy itself is a violation of federal law. *See Barney*, 143 F.3d at 1307; *see also Brown*, 520 U.S. at 404, 117 S.Ct. 1382 (holding a plaintiff may attack a "particular municipal action itself" (emphasis omitted)). Alternatively, a plaintiff may saddle a municipality with § 1983 liability despite facially valid policies and customs by demonstrating "deliberate indifference" on the part of the local government. *Barney*, 143 F.3d at 1307.

¶ 80 Mr. Howe did not bring a facial attack on any Salt Lake City policy as a violation of federal law. Thus, the only avenue left open to Mr. Howe is a theory that "lawful municipal action has led an employee to violate a plaintiff's rights [by] demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407, 117 S.Ct. 1382 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. This standard may be satisfied through a showing of a pattern of tortious conduct that provides city officials with notice through repeated constitutional violations. *See id.* The route to municipal liability under § 1983 through a deliberate indifference argument is a narrow one; the Supreme Court demands application of "rigorous standards of culpability and causation ... to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405, 117 S.Ct. 1382.

¶ 81 The phrase "pattern of tortious conduct" has not been clearly defined. The case law suggests, however, that the local government is on notice of such a pattern only after repeated violations have harmed others in addition to the plaintiff. *See Daskalea v. Dist. of Columbia*, 227 F.3d 433, 441–42 (D.C.Cir.2000) (finding a pattern of tortious conduct where the governmental entity was previously found to be deliberately indifferent to the sexual abuse of female prisoners, yet did nothing to halt the continued "open and notorious" sexual abuse and harassment); *Barney*, 143 F.3d at 1308 (stating "no pattern of violations existed to put the County on notice" when officials were unaware of any previous sexual assaults by a deputy); *Crownover v. City of Lindsay*, No. 99–6346, 2000 WL 1234852 at *3, 2000 U.S.App. LEXIS 22390 at *10 (10th Cir. Sept. 1, 2000) (finding the city was not on notice of a pattern of tortious conduct because the city was unaware of any allegations of sexual assault by a deputy until after the plaintiff's allegations surfaced); *Trujillo v. Shields*, No. 97–1309, 1998 WL 856135 at *2–3, 1998 U.S.App. LEXIS 31148 at *6–7 (10th Cir. Dec. 11, 1998) (holding a plaintiff's allegations of nonconsensual sexual contact by a police officer with two separate women failed to show

"continuing, persistent, and widespread" violations giving rise to deliberate indifference by city officials); *Boyett v. Cnty. of Wash.*, No. 2:04cv1173, 2006 WL 3422104 at *31, 2006 U.S. Dist. LEXIS 86910 at *105 (D.Utah Nov. 28, 2006) (holding the fact that a prisoner died in custody is insufficient to conclude the county had ample notice of potential prisoner deaths through a pattern of tortious conduct).

¶ 82 In this case, Mr. Howe alleges the city acted with deliberate indifference to Ms. Werner's "undisputed pattern of defamation" and that the Salt Lake City officials "failed to discipline Ms. Werner." First, we do not see how Ms. Werner's generalized criticism of the alarm industry defamed Mr. Howe or Peak Alarm. Moreover, Mr. Howe has failed to show any pattern of alleged tortious behavior that would put Salt Lake City on notice of repeated constitutional violations. Therefore, the district court did not err in dismissing Mr. Howe's claim against Salt Lake City because city officials did not have actual or constructive notice of unlawful acts by Ms. Werner giving rise to deliberate indifference.

2. The District Court Did Not Err in Dismissing Mr. Howe's Claim Against the Defendant Supervisors Because Neither the Police Chief Nor the Assistant Police Chief Is Linked to Constitutional Violations by Subordinates

¶ 83 In limited circumstances, a supervisor may be held liable under § 1983 for the acts of a subordinate. *See Fogarty*, 523 F.3d at 1162. A plaintiff attempting to impose supervisor liability must first demonstrate that the supervisor's subordinates violated a constitutional right held by the plaintiff. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir.2006). Subsequent to this initial showing, the plaintiff "must show an 'affirmative link' between the supervisor and the violation." *Id.* (quoting *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir.2001)). The affirmative-link mandate is a product of the plain language of § 1983 that only allows " '[i]ndividual liability

... based on personal involvement in the alleged constitutional violation.' " *Fogarty*, 523 F.3d at 1162 (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.1997)). Under § 1983, personal liability is never derived from the mere fact that a supervisor possessed some amount of control over the government employee who committed a constitutional violation. *See Serna*, 455 F.3d at 1151 ("[I]t is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation." (internal quotation marks omitted)). The affirmative-link standard, however, is not so limited that it eliminates all liability that does not involve the supervisor's actual participation in the violation. *See Fogarty*, 523 F.3d at 1162.

¶ 84 The affirmative-link standard is measured by a two-part showing. First, the analysis focuses on the supervisor's conduct in an attempt to discover whether the supervisor "actively participated or acquiesced in the constitutional violation." *Serna*, 455 F.3d at 1152 (quoting *Holland*, 268 F.3d at 1187). In *Holland v. Harrington*, the Tenth Circuit Court of Appeals held that active participation or acquiescence is proven through a supervisor's direct participation, exercise of control or direction, or a failure to supervise. 268 F.3d at 1187 (citing *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir.2000)). Second, a supervisor can only be held liable for the acts of a subordinate if the plaintiff establishes that the supervisor "had a culpable state of mind," which is generally shown through deliberate indifference on the part of the supervisor. *Serna*, 455 F.3d at 1154–55. "Deliberate indifference requires that the official 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir.2003)).

¶ 85 In the district court, Mr. Howe attempted to impose liability on the former Police Chief and the Assistant Police Chief

for the alleged constitutional violations by Sgt. Bryant and Ms. Werner. Sgt. Bryant and Ms. Werner were their subordinates during the time period relevant to this litigation. Pursuant to Parts III. A and B, Mr. Howe's only surviving constitutional claim against either of the employees is an action for an unlawful seizure arising under the Fourth Amendment. Therefore, Mr. Howe is required to establish an affirmative link between the unconstitutional seizure and some personal involvement by the supervisors.

¶ 86 To accomplish this, Mr. Howe directs us to one statement each by the Chief and Assistant Chief. As to the Police Chief, Mr. Howe points to an e-mail the Chief authored, in which he described the alarm industry as "unscrupulous." We find it difficult to see how this e-mail demonstrates active participation or acquiescence in the disputed seizure of Mr. Howe. The e-mail is not directed at Sgt. Bryant or Ms. Werner.[14] Nor does Mr. Howe allege the e-mail ever reached either employee. Further, the e-mail was sent on November 17, 2003, some three months after Mr. Howe's disputed seizure. This e-mail cannot be construed as direct participation in Mr. Howe's seizure or as a failure to supervise an employee. Thus, the district court correctly dismissed Mr. Howe's claim against the Police Chief on the basis of supervisor liability.

¶ 87 Next, Mr. Howe points to an e-mail between the Assistant Chief and Ms. Werner in an effort to suggest that the Assistant Chief encouraged unlawful behavior. That e-mail came in response to a message sent from Ms. Werner to the Assistant Chief and the current Police Chief. Ms. Werner's e-mail is titled "My new motto in regards to the alarm industry" and the text is a quote that states "I never did give anybody hell. I just told the truth and they thought it was hell." The Assistant Chief responded, "I like it." This e-mail was authored on September 21, 2004, nearly fifteen months after the dis-

puted seizure. Mr. Howe directs us to no other facts that demonstrate the Assistant Chief directly participated or acquiesced to an unlawful seizure of Mr. Howe through either his direct participation or failure to supervise Sgt. Bryant and Ms. Werner. Thus, the district court did not err in dismissing Mr. Howe's claim of supervisor liability.

## CONCLUSION

¶ 88 We hold that the trial court correctly rejected Mr. Howe's motion for partial summary judgment on the basis of collateral estoppel and the totality of the circumstances. Mr. Howe was unable to prove as a matter of law that he was arrested and prosecuted without probable cause. But we hold that the district court erred when it dismissed Mr. Howe's state claims because he in fact provided sufficient notice in a timely manner as required by the UGIA.

¶ 89 Finally, we affirm in part and reverse in part the district court's ruling on Salt Lake City's motion for summary judgment on Mr. Howe's federal claims sounding in § 1983. We hold that the district court erred in dismissing Mr. Howe's Fourth Amendment seizure claim because Mr. Howe presented facts sufficient to allege that an unlawful seizure occurred. Nonetheless, we affirm the district court's decision to dismiss the remaining claims against Ms. Werner, Sgt. Bryant, their supervisors, and Salt Lake City.

¶ 90 We therefore remand this case to the district court for disposition of Mr. Howe's state claims as discussed in Part II, note 7, and Mr. Howe's unlawful seizure claim under § 1983.

¶ 91 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.

---

14. The e-mail appears to be a discussion between a number of police chiefs from around the county about whether a national committee should

accept funding from the Alarm Industry Association.