**2015 UT App 125**

## THE UTAH COURT OF APPEALS

DAO TRANG PHAP HOA,
Plaintiff, Counterclaim Defendant, and Appellee,

*v.*

*VIETNAMESE UNIFIED BUDDHIST ASSOCIATION OF UTAH*, THUAN
TRAN, HOA VO, AND CHUC PHAN,
Defendants, *Counterclaim Plaintiff*, and Appellants.

VIETNAMESE UNIFIED BUDDHIST ASSOCIATION OF UTAH,
Third-party Plaintiff and Appellant,

*v.*

VIETNAMESE-AMERICAN UNIFIED BUDDHIST CONGRESS
IN THE UNITED STATES OF AMERICA,
Third-party Defendant and Appellee.

Opinion
No. 20130998-CA
Filed May 21, 2015

Third District Court, Salt Lake Department
The Honorable Kate A. Toomey
No. 110911069

S. Grace Acosta, Attorney for Appellants Vietnamese
Unified Buddhist Association of Utah, Hoa Vo, and
Chuc Phan

Terry M. Plant and Stewart B. Harman, Attorneys for
Appellant Thuan Tran

David L. Mortensen, Jill M. Pohlman, and Dallis N.
Rohde, Attorneys for Appellees Dao Trang Phap Hoa
and Vietnamese-American Unified Buddhist
Congress in the United States of America

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
JAMES Z. DAVIS and J. FREDERIC VOROS JR. concurred.

PEARCE, Judge:

¶1     This matter concerns the ownership of a Buddhist temple. The district court granted summary judgment to the entity that holds title to the temple on claims that the title owner held the temple in constructive trust for the members of an organization that formerly owned the temple. Those members appealed the grant of summary judgment. Because the district court did not err in determining that the members lacked standing to assert a constructive trust, we affirm.

BACKGROUND

¶2     In April of 1993, the Vietnamese Buddhist Alliance Society of Utah (the Society) filed articles of incorporation with the State of Utah. The Society started with approximately a dozen members and was formed as a non-profit religious entity. Thuan Tran, Hoa Vo, and Chuc Phan were appointed to its board of trustees. In 1994, the Society became a member of the Vietnamese-American Unified Buddhist Congress in the United States of America (the Congress).

¶3     In 1994, the Society purchased two undeveloped lots with plans to build a temple on them. In 1996, the Society decided not to build on the lots but to instead purchase an unused library and convert it into a temple. The Society acquired the building in October of 1996, and the purchase deed transferred title to the "Vietnamese/Buddhist Alliance Church."[1] The former library was then consecrated as the Pho Quang Pagoda.

---

1. The Vietnamese/Buddhist Alliance Church was apparently one of several names employed by the Society. In order to "correct vesting," the property was quitclaimed to the Society under its official name in March of 1997.

¶4    At some point in 1999, a group of "about 19 people" including Te Phan, an original member of the Society, alleged that Thuan Tran intended to deed the Pagoda to his heirs. To quell such rumors, Thuan Tran proposed that the Society deed the Pagoda to the Congress, apparently intending that the Congress would "hold it for [the Society]." Thuan Tran informed the board of the Society of his plan and allegedly claimed that the Congress would be the owner of the Pagoda "on paper only" and that the Society would retain control of the operation and maintenance of the Pagoda. However, the board's letter to the Congress stated that they "voluntarily immolate all the properties of Pho Quang [Pagoda] to [the Congress] without any binding conditions."[2] A majority of the Society's members voted to transfer ownership of the Pagoda, and Thuan Tran, in his role as the president of the board of trustees, conveyed the Pagoda to the Congress by quitclaim in March 2000 without any express reservation of rights. None of the documents evidencing the transfer mention or even suggest that the parties intended Congress to hold the property in trust.

¶5    The Society last renewed its corporate registration with the Utah Department of Commerce on March 4, 1999, and its registration expired on June 26, 2001. Nevertheless, some members of the Society continued to hold meetings. At a November 20, 2005 meeting, those present voted to "change [the] corporate name." However, on December 8, 2005, rather than amending the Society's articles of incorporation, Hoa Vo and two other people registered a new entity named the Vietnamese Unified Buddhist Association of Utah (the Association) with the Utah Department of Commerce. Some, but

---

2. This letter was originally written in Vietnamese and we quote the certified translation included in the record. From context and the parties' briefing, we understand the word "immolate" to signify a transfer.

not all, of the Society's members became members of the Association.

¶6 In 2009, the Congress appointed Thich Tri Lang, a Buddhist monk, to manage the Pagoda. Thich Tri Lang was the president of Dao Trang Phap Hoa, a religious organization that was also a member of the Congress. In February of 2011, the Congress transferred ownership of the Pagoda to Dao Trang Phap Hoa and charged Thich Tri Lang with providing spiritual guidance to those seeking it at the temple. This transfer was memorialized in a quitclaim deed recorded on March 4, 2011.

¶7 On May 5, 2011, Dao Trang Phap Hoa filed a complaint seeking to evict the Association from the Pagoda. The complaint named as defendants the Association, Thuan Tran, Hoa Vo, and Chuc Phan (Defendants). The Association filed a counterclaim against Dao Trang Phap Hoa and a third-party complaint against the Congress, alleging that the Congress held the Pagoda in trust for the benefit of the Association. Both camps eventually filed motions for summary judgment.

¶8 The district court first considered whether there was a genuine issue of material fact as to the existence of a trust. It determined that there was no documentary evidence of a written trust. It next ruled that the Association could not show that an oral express trust existed, because there was no evidence "establish[ing] the Congress's agreement to hold [the Pagoda] in trust." The district court also determined that the Association lacked standing to seek imposition of a constructive trust. Finally, the district court noted that the statute of limitations appeared to bar the Association's counterclaims.[3] The district

_____

3. Although the district court noted that the claims appeared to be time-barred, it determined that "the Court need not decide this" issue in light of its other legal conclusions. Because the

(continued…)

court granted summary judgment to the Congress and certified its decision as final for appeal pursuant to rule 54(b) of the Utah Rules of Civil Procedure.

ISSUES AND STANDARD OF REVIEW

¶9     Defendants contend (1) that the district court improperly engaged in factfinding regarding the existence of an oral express trust and (2) that the Association had standing to seek, and had introduced sufficient evidence to support, imposition of a constructive trust. On appeal from a district court's summary judgment ruling, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and review the district court's legal conclusions and ultimate grant or denial of summary judgment for correctness. *Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App 259, ¶ 2, 338 P.3d 825.

ANALYSIS

I. Standing

¶10    We first address whether the Association had standing to seek imposition of a constructive trust. The district court determined that the Association and the Society were distinct legal entities:

> Some of the members are the same, but not all, and indeed some members of the Society are not members of the Association. Likewise, the

---

(…continued)

statute of limitations was not a basis for the district court's decision, we do not address the issue on appeal.

> leadership of the organizations has not been identical. There was no consolidation of the organizations, and approximately four years lapsed between the Society's cessation of operations and the initiation of the Association. They have different articles of incorporation, identified by different names.

The district court then noted that Defendants had not identified "any transfer, merger, or assignment that would support the factual and legal conclusion that whatever the Congress owed to the Society, it now owes to the Association."

¶11 On appeal, Defendants contend that they had no obligation to "introduce such evidence because [their] theory is that there was no transfer, merger, or assignment because the group[] simply changed its name." They then cite a litany of evidence showing that the Society used multiple English names, including "Vietnamese Unified Buddhist Association of Utah," and a single Vietnamese name, "Hôi Phât Giaó Viêt Nam Thô'ng Nhâ't Utah." Defendants also point to the significantly overlapping (though not identical) membership of the two organizations as evidence suggesting that they were a single entity.

¶12 Defendants also refer to utility bills and bank statements addressed to a multitude of names, including those of the Society and the Association. Despite the disparate names, this correspondence was sent to a single address. Defendants argue that this evidence created a factual dispute as to whether the two organizations were in fact a single entity whose name had been changed.[4]

---

4. Defendants refer to many of the alternative names as "DBAs," or "doing business as" names, but cite no evidence showing that

(continued…)

¶13    Defendants do not dispute that the legal documents show that the Society and the Association are two separate legal entities.[5] Instead, they argue that by pointing to evidence that many of the members of the Society were also members of the Association and acted as if the two entities were one and the same, they created a genuine issue of material fact to be resolved at trial regarding whether the Association was simply the Society acting under a different name. Defendants do not, however, provide any case law or other authority supporting their argument that the district court was entitled to look past the corporate filings because some of the members of the original entity believed that the new organization was either a continuation of or a successor to the original. *Cf.* Fletcher Cyclopedia of the Law of Corporations § 2453 (2014) ("An amendment to change the corporate name follows the same procedural steps as any other amendment to the articles or certificate of incorporation.").

¶14    The issuance of a certificate of incorporation creates a new corporation. *See Vincent Drug Co. v Utah State Tax Comm'n*, 407 P.2d 683, 684 (Utah 1965) (noting that "a corporation begins to exist upon the issuance of the certificate of incorporation"), *overruled on other grounds as recognized by American Vending Servs.,*

---

(…continued)
the names were in fact DBAs registered with the Utah Department of Commerce.

5. Several members of the Society voted to change the name of the organization. However, instead of filing an amendment to the Society's articles of incorporation, Hoa Vo and two other members registered a new corporate entity—the Association. The Association had its own articles of incorporation and was assigned a separate entity number by the Utah Department of Commerce.

*Inc. v. Morse*, 881 P.2d 917 (Utah Ct. App. 1994). And "[i]t is a fundamental precept of corporate law that each corporation is a separate legal entity." *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007); *In re Biorge*, No. 10-23318, 2011 WL 1134109, at *1 (Bankr. D. Utah Mar. 28, 2011) (same).

¶15    Two corporate entities "are separate and distinct legal entities" even if they have identical memberships and ownerships. *See Surgical Supply Ctr. v. Industrial Comm'n, Dep't of Emp't Sec.*, 223 P.2d 593, 595 (Utah 1950); *see also Institutional Laundry, Inc. v. Utah State Tax Comm'n*, 706 P.2d 1066, 1067–68 (Utah 1985) (per curiam) (holding that a subsidiary corporation was a separate legal entity obligated to pay sales taxes on services it provided to its parent corporation despite being wholly owned by the parent corporation and having an identical board of directors). Our supreme court has further held that two corporations that had the same management and were "practically indistinguishable" were nevertheless separate entities and thus "refuse[d] to recognize them as the same entity for standing to sue on a contract." *Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 53 n.6, 48 P.3d 895.

¶16    Defendants seek to avoid the reach of this principle by arguing that the cases illustrating it all involved deliberate attempts to operate as separate corporations. Defendants assert that they fall outside that case law because they did not intend for the Association and the Society to be two separate corporations and they were "really a continuation of each other." Defendants did not provide this court with any legal authority to establish that this is a distinction of legal significance. The undisputed evidence before the district court demonstrated that the Society's corporate registration lapsed in 2001 and the Association was formed in 2008. There was no evidence before the district court that any of the Society's rights or obligations were ever formally transferred to the Association. Without case law or other authority attaching legal significance to the fact that

some members believed and acted as if the Society and Association were the same entity, we are left with the general rule that two organizations with separate corporate filings are treated as distinct entities.[6]

¶17 Accordingly, we conclude that the district court did not err in determining that the Society and the Association were separate legal entities and that the Association lacked standing to press claims properly belonging to the Society.

## II. Remaining Claims

¶18 Defendants contend that "[t]he juxtaposition of factual claims by Plaintiff with factual claims by Defendants should have precluded summary judgment." Defendants complain that the district court's summary judgment ruling "contains statements such as (1) 'Defendants counter that' or (2) 'Defendants do not dispute this, but counter' and then identifies conflicting evidence." However, the mere existence of conflicting evidence does not preclude summary judgment when the conflict pertains to an issue not material to the outcome of the case. *See* Utah R. Civ. P. 56(c); *Doyle v. Lehi City*, 2012 UT App 342, ¶ 19, 291 P.3d 853. An evidentiary conflict relates to an immaterial fact when either resolution of the conflict would lead to the same legal result. *See Doyle*, 2012 UT App 342, ¶¶ 19–20; *see also Crossgrove v. Stan Checketts Props., LLC*, 2015 UT App 35, ¶ 12, 344 P.3d 1163.

---

6. Defendants also argue that the district court erred by weighing the corporate filings against evidence that some members treated the Association as a continuation of the Society. The district court did not weigh the evidence as much as it determined that the evidence Defendants provided lacked legal significance to answer the question before it.

¶19　Defendants assert that an evidentiary conflict existed concerning the intent of the Society and the intent of the Congress at the time the Pagoda was quitclaimed to the Congress. Defendants argue that this was material to determining whether the Congress held the Pagoda in trust.

¶20　Defendants next assert that they presented sufficient evidence to create a disputed issue of fact material to the existence of a failed express trust. Again, they point to evidence of the Society's intent when it quitclaimed the Pagoda to the Congress. They also note evidence suggesting that the Congress did not act as if it owned the Pagoda.

¶21　Defendants also argue that the district court erred by determining that "the Association failed to properly plead constructive trust based upon unjust enrichment." It is true that the district court's ruling noted that this "theory was not among those pled in the Counterclaim and Third-Party Complaint." However, the ruling continued, "[E]ven if it had been, the Defendants cannot establish this claim." The district court then explained why such a theory would have failed on the merits.

¶22　Each of the evidentiary conflicts Defendants identify concerns the existence of a trust. But none of the conflicts pertain to who the beneficiary of a trust would be if a trust were proved to exist. If the conflicts had been resolved in Defendants' favor, the result would simply have been that the Pagoda was held in trust for the Society. As we explain above, Defendants are not the Society, and they have not put forward any evidence suggesting that the Society transferred any trust rights to the Association or the other defendants. Accordingly, the claimed factual conflicts addressed in Part II are immaterial to the ultimate issue—whether Defendants possessed some legal right in the Pagoda. Defendants have therefore failed to show that a genuine issue as to any *material* fact exists.

CONCLUSION

¶23 We conclude that the Association and the Society are distinct legal entities and that even if the Association did raise a genuine issue of material fact on the question of whether the Congress held the Pagoda in trust for the Society, there is no legal basis for the Association to claim that it possesses and can enforce any right the Society enjoys. The evidentiary conflicts identified by the district court and Defendants are immaterial, and the district court did not err in granting summary judgment.

¶24 Affirmed.

_____